E-FILED
Wednesday, 29 September, 2021  04:02:49 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| JERRY BROWN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-04275-SLD |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER

Before the Court are Petitioner Jerry Brown's Motion to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody, Pursuant to Title 28, United States Code, § 2255

("2255 Motion"), ECF No. 1, and Motion to Amend, ECF No. 13.  For the reasons that follow,

both motions are DENIED.

## BACKGROUND[1]

A criminal complaint filed on March 26, 2012 alleged that Brown and Frederick Coleman

had been conspiring to distribute crack cocaine in Henry County, Illinois in violation of 21

U.S.C. § 841(a)(1), (b)(1)(A) and § 846 since December 2010.  Compl., Cr. ECF No. 1.  On

April 18, 2012, the grand jury returned an indictment charging Brown, Coleman, Darrion Capers,

Nicholas Clark, and James Tatum with conspiracy to distribute at least 280 grams of crack

cocaine in violation of 21 U.S.C. § 841(a) and (b)(1)(A).  Indictment 1–2, Cr. ECF No. 9.  A

superseding indictment adding another co-conspirator was filed on August 22, 2012.

Superseding Indictment, Cr. ECF No. 65.

---

[1] References to Brown's underlying criminal case, *United States v. Brown*, 4:12-cr-40031-SLD-JEH-2, take the
form: Cr. ___.

After Brown's retained counsel withdrew, the Court appointed Assistant Federal Public Defender George Taseff to represent Brown.  *See* Cr. June 14, 2012 Text Order.  Brown, Coleman, Capers, and Clark (collectively, "Defendants" or "Co-Defendants") went to trial.  *See, e.g.*, Cr. May 13, 2013 Min. Entry.  They were all found guilty of conspiracy to distribute and possess at least 280 grams of crack cocaine.  *See generally* Verdicts, Cr. ECF No. 195.  Brown was sentenced to life imprisonment, Judgment 1–2, Cr. ECF No. 249, because he had at least two prior drug felonies, *see* Revised Presentence Investigation Report ¶¶ 4, 104, Cr. ECF No. 223; Sentencing Hr'g Tr. 51:9–11, Cr. ECF No. 288; 21 U.S.C. § 841(b)(1)(A) (effective Aug. 3, 2010 to Dec. 20, 2018) (providing that an individual convicted under § 841(b)(1)(A) "shall be sentenced to a mandatory term of life imprisonment" if he commits the crime after "two or more prior convictions for a felony drug offense have become final").

Brown appealed.  Not. Appeal, Cr. ECF No. 255.  He was represented by Assistant Federal Public Defender Johanna Christiansen.  Taseff Aff. ¶ 4, ECF No. 8-1.  Brown challenged some of the Court's evidentiary rulings from trial, argued that he did not receive due process because of the cumulative effect of trial errors, and argued that his life sentence was improper because "a jury did not find the existence of [his] prior felonies."  *United States v. Brown*, 822 F.3d 966, 971, 975, 976 (7th Cir. 2016).  The Seventh Circuit rejected those arguments and affirmed both his conviction and sentence.  *Id.* at 971–76, 978.  The court said the following about the evidence presented against Defendants at trial:

> [T]he evidence of their guilt was overwhelming.  It included testimony from more than a dozen witnesses who purchased crack cocaine or worked with the defendants and knew the day-to-day operations of the conspiracy, eight controlled buys monitored by law enforcement, and phone records and recorded jail calls in which members of the conspiracy plotted to cover up and maintain the conspiracy after their arrest.

2

*Id.* at 973.  Brown filed a petition for a writ of certiorari from the United States Supreme Court, which was denied on October 3, 2016.  *Brown v. United States*, 137 S. Ct. 248 (2016) (mem.).

Brown filed his 2255 Motion on September 26, 2017.  2255 Mot. 11 (declaring that he put his motion in the prison mailing system on September 26, 2017);[2] *see* Rule 3(d), Rules Governing § 2255 Proceedings ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing.").  He claims that he received constitutionally ineffective assistance of counsel from both his trial counsel and his appellate counsel.  *See* 2255 Mot. 4–7.  In a supplemental filing, he identified numerous specific grounds of alleged ineffective assistance of counsel by trial and appellate counsel.  *See* Statement Grounds Supp. 6–29, ECF No. 4.[3]  Brown then filed a motion to amend his 2255 Motion to include a claim pursuant to Amendment 503 to the United States Sentencing Guidelines, *see* United States Sentencing Guidelines Manual App. C, Vol. I, § 503.  Mot. Amend 1; Decl. Supp. Mot. Amend 2, ECF No. 13-2.

Because of the diffuse nature of Brown's allegations, the Court provides further factual and procedural background along with its legal analysis of each asserted ground of ineffective assistance of counsel.

---

[2] The internal pagination of Brown's 2255 Motion is inconsistent—there are two page 5s and then it skips from page 9 to page 11—so for clarity the Court uses the CM/ECF-generated page numbers.
[3] Some of the grounds Brown initially asserted were withdrawn in his reply, *see* Reply 15, 21, 22, 26, ECF No. 11–11-1 at 6, so the Court will not address them.

**DISCUSSION**

I.    **2255 Motion**

    a.  **Legal Standards**

A prisoner in federal custody may move the court that imposed his sentence to vacate, set

aside, or correct it.  28 U.S.C. § 2255(a).  "[R]elief under § 2255 is an extraordinary remedy

because it asks the district court essentially to reopen the criminal process to a person who

already has had an opportunity for full process."  *Almonacid v. United States*, 476 F.3d 518, 521

(7th Cir. 2007).  Accordingly, such relief "is available only when the 'sentence was imposed in

violation of the Constitution or laws of the United States,' the court lacked jurisdiction, the

sentence was greater than the maximum authorized by law, or it is otherwise subject to collateral

attack."  *Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) (quoting 28 U.S.C.

§ 2255(a)).

The Sixth Amendment guarantees criminal defendants the right to the effective assistance

of counsel.  U.S. Const. amend. VI.  Claims of ineffective assistance of counsel are subject to the

two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  This test requires a

petitioner to show that his counsel's performance "fell below an objective standard of

reasonableness" and that he suffered prejudice as a result.  *Id.* at 688, 692.  The court applies "a

strong presumption that decisions by counsel fall within a wide range of reasonable trial

strategies."  *United States v. Shukri*, 207 F.3d 412, 418 (7th Cir. 2000) (quotation marks

omitted).  The petitioner "must rebut this presumption by proving that his attorney's

representation was unreasonable under prevailing professional norms and that the challenged

action was not sound strategy."  *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).  To

demonstrate prejudice, the petitioner "must show that there is a reasonable probability that, but

4

for counsel's unprofessional errors, the result of the proceeding would have been different."
*Strickland*, 466 U.S. at 694.

### b. Analysis

The Court will address Brown's grounds of ineffective assistance of counsel separately and then cumulatively. *See Myers v. Neal*, 975 F.3d 611, 623 (7th Cir. 2020) ("Where, as here, the record shows more than one instance of deficient performance, the Sixth Amendment requires that we approach the prejudice inquiry by focusing on the cumulative effect of trial counsel's shortcomings."); *Washington v. Smith*, 219 F.3d 620, 634−35 (7th Cir. 2000) ("Evaluated individually, [counsel's] errors may or may not have been prejudicial to [the petitioner], but we must assess the totality of the omitted evidence under *Strickland* rather than the individual errors." (quotation marks omitted)).

### i. Trial Counsel

#### 1. Waived Presence and Restraints

Brown's first two arguments are intertwined, so the Court will address them together. Brown and his Co-Defendants were required to wear leg restraints throughout most of the trial. Brown argues first that counsel was ineffective for waiving Brown's presence during the hearings in which the restraints were discussed. Statement Grounds Supp. 6. He argues second that counsel was ineffective for failing to "insist[] that the [C]ourt conduct a colloquy with [Brown] on th[e] issue," *id.* at 6–7, and for failing to make additional arguments against the use of leg restraints, *see id.* at 8–11.[4] The Government responds that Brown's presence was not required during the chambers conferences where this issue was discussed. *See* Resp. 21–23,

---

[4] The title of Brown's claim suggests he is only objecting to counsel's failure to ensure a colloquy occurred. *See* Statement Grounds Supp. 6. But he goes on to argue that counsel should have requested that the Court consider additional factors. *See id.* at 10–11. The Court construes this as a claim that counsel should have made additional arguments beyond simply objecting to the restraints.

ECF No. 8.  It also argues that "at no time throughout the conferences regarding whether Brown was to wear leg restraints was Brown's counsel performing ineffectively," noting that counsel did move for removal of the restraints, but lost.  *Id.* at 25.  Further, the Government argues that Brown "fails to show any prejudice whatsoever in regard to the use of leg restraints during trial" because "he fails to present any evidence that the jury was even aware of the use of such restraints."  *Id.* at 25–26.

Leg restraints were first mentioned in a chambers conference held outside the presence of Defendants before jury selection began.  *See* Trial Tr. Volume 1 3:2–3, 4:17–5:10, Cr. ECF No. 336.  The Court inquired whether any counsel wanted their clients present; a Co-Defendant's counsel said that "so long as" they would only discuss "preliminary matters, it[ was] okay to proceed" without his client and Brown's counsel agreed.  *Id.* at 3:17–23.  The Court noted that "[a]t the request of" the United States Marshals ("USM"), skirting was put around Defendants' counsel table "in the event" Defendants would be restrained at some point during trial.  *Id.* at 4:19–24.  The Court noted that it would leave within the discretion of the USM "what they need to do as far as security."  *Id.* at 4:24–5:1.

The next time leg restraints were mentioned was during jury selection when Defendants' attorneys noticed that Defendants had leg restraints on.  *See id.* at 5:25–6:3.  In the presence of Defendants, *id.* at 5:12–13, their attorneys moved to remove the restraints, *id.* at 6:5–7:1; *id.* at 6:21–24.  The Court noted that it had "taken steps to reduce the possibility that any prospective jurors or jurors in th[e] case w[ould] be able to []view the manner in which . . . [D]efendants [we]re restrained," such as skirting counsel table.  *Id.* at 8:10–14.  The Court then called Deputy Marshal Hollenback into the hearing.  *Id.* at 9:6–12.  Hollenback stated that it was "the preference of the" USM that Defendants wear leg restraints.  *Id.* at 11:5–6.  The Court directed

6

that the restraints be removed for jury selection and indicated it would reconsider that ruling for the remainder of the trial later. *Id.* at 11:9–13.

The next day, the Court brought up the restraint issue again, but the Government indicated that the USM requested that the issue be discussed "outside the presence of the [D]efendants because there may be some security issues that would come in . . . to the public." Trial Tr. Volume 2 40:14–24, Cr. ECF No. 337. The Court decided to address the issue at the next morning's chambers conference, *id.* at 40:25–41:2, but specified that it would make an appropriate record with Defendants in the courtroom if necessary, *id.* at 41:2–5.

Thus, the next day, outside the presence of Defendants, Trial Tr. Volume 3 46:1–3, Cr. ECF No. 338, the Court revisited the issue of physical restraints, *id.* at 51:5–7. Hollenback indicated that his staff had brought to his attention that Defendants had been "looking to see if" the USM had their "weapons on and where they[ were being] carried." *Id.* at 51:25–52:4. He noticed personally that Defendants had been looking to see what was beyond doors. *Id.* at 52:4–6. He also indicated that Defendants allegedly had violent pasts, that they had incidents in the cell block with threats toward trial witnesses, and that because of the seriousness of the charges and penalties, the USM "would feel much more comfortable with the restraints on." *Id.* at 52:7–14. When asked to elaborate about the alleged threats, Hollenback stated that Brown said to a cooperator who had negotiated a plea agreement, "I'm gonna whip your ass" and then to Hollenback, "You better keep me away from him." *Id.* at 52:19–53:10.

The Court determined that leg restraints would be used during the remainder of the trial. *Id.* at 61:21–25. It based this decision on the seriousness of the charges against Defendants and the potential penalties they faced, Defendants' substantial criminal history, an increased need to protect the physical security of the courtroom in light of the fact that there were four Defendants

7

at counsel table, and prior evidence of threats made by Defendants against cooperating witnesses (including evidence of threats, beatings, and comments about snitches and cooperators that the Court came across when ruling on pretrial motions). *Id.* at 59:20–61:10.  It acknowledged Defendants' right to due process and their presumption of innocence but found that in light of the above-identified factors, there was a justified state interest in having Defendants restrained. *Id.* at 61:18–25.  However, the Court also noted that it was imperative that the restraints be used in an unobtrusive fashion so the USM would need to ensure that Defendants were seated prior to the jury entering the courtroom, keep the skirting on the tables, and keep the windows covered. *Id.* at 62:1–25.  The Court also asked that the restraints be taped to avoid noise, *id.* at 72:2–4, and arranged for skirting to be added to the Government's counsel table as well to avoid any inference from the skirting, *id.* at 72:21–73:23.  Moreover, the Court noted that if Defendants testified, their restraints would be removed, *id.* at 63:6–15, and made arrangements for sidebars where Defendants' presence was necessary to occur outside the presence of the jury, *see id.* at 67:19–68:2.  After Defendants reentered the courtroom, but prior to the jury's entry, the Court explained to them that leg restraints would be used for the remainder of trial and the basis for that decision. *Id.* at 69:23–71:24.

First, the Court will address whether counsel was ineffective for waiving Brown's presence at the hearings to discuss restraints.  "[A] criminal defendant's right to be present at trial is constitutional bedrock." *United States v. Benabe*, 654 F.3d 753, 768 (7th Cir. 2011).  The Sixth Amendment provides a right to be present at trial and the Due Process clauses of the Fifth and Fourteenth Amendments provide a right to be present "to the extent that a fair and just hearing would be thwarted by [the defendant's] absence." *Id.* (quotation marks omitted). Federal Rule of Criminal Procedure 43(a)(2) further provides that a "defendant must be present

at every trial stage, including jury empanelment and the return of the verdict." But "[a] defendant need not be present" where "[t]he proceeding involves only a conference or hearing on a question of law." *Id.* 43(b)(3).

Brown's counsel declares that it "was [his] belief that . . . Brown's physical presence in court during the Court's consideration of this matter and issues relating to courtroom security was not required under Rule 43(b)(3)." Taseff Aff. ¶ 9. Likewise, the Government appears to argue that these issues were only discussed at conferences that Brown had no right to attend. *See* Resp. 21–23. Brown's presence was certainly not required at the chambers conference held before jury selection began—it was to discuss preliminary matters and no decisions were made on restraints—so counsel was not ineffective for waiving Brown's presence then. The Court's final decision on the matter was also made outside the presence of Defendants. Neither the Government nor Brown provide the Court with caselaw that explains what constitutes a "conference" or that discusses whether Rule 43 or the Constitution require a defendant's presence at a hearing to decide whether restraints will be used. But regardless of whether Brown had a right to be present at that hearing that counsel should have asserted, Brown shows no prejudice. He does not explain how his presence during the discussions of whether to restrain Defendants would have changed the Court's decision.

Next, the Court addresses Brown's arguments regarding the decision to require him to wear leg restraints. "A defendant in a criminal case has the right to appear before a jury free from shackles or other physical restraints." *United States v. Van Sach*, 458 F.3d 694, 699 (7th Cir. 2006). But that right is "not absolute." *Id.* (citing *Holbrook v. Flynn*, 475 U.S. 560, 567–68 (1986)). "The right to be free from shackles at trial 'may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum.'"

9

*Id.* (quoting *Deck v. Missouri*, 544 U.S. 622, 629 (2005)); *Deck*, 544 U.S. at 629 ("[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.").

Despite Brown's contention that the Court needed to conduct a colloquy with him, Statement Grounds Supp. 7, there are no particular procedures the Court must follow when determining whether to exercise its discretion to restrain a defendant.[5]  *See Deck*, 544 U.S. at 629 (noting that "[l]ower courts have disagreed about the specific procedural steps a trial court must take prior to shackling" but declining to outline such steps).  Thus, certainly Brown's counsel did not perform deficiently by failing to ensure a colloquy took place.  And contrary to Brown's contention that, for example, the Court had to consider twelve factors but "*only considered* one" and that it "rel[ied] blindly on the opinion of the" USM in determining that restraints were warranted, *see* Statement Grounds Supp. 10–11, the Court considered numerous factors in making its decision.  Ultimately, it relied on concerns specific to this case in determining leg restraints were necessary: there were multiple Defendants in the courtroom, which posed a heightened security risk; USM had noticed concerning behavior from Defendants; Defendants were facing severe penalties and had significant criminal histories; and there was evidence of past threats against witnesses by Defendants.  The arguments Brown wishes his counsel would have made were already considered by the Court, so they would not have changed the Court's decision.

Moreover, Brown has not shown that counsel's alleged errors prejudiced him.  There is no evidence that the restraints were visible to the jury—and the Court took extensive precautions

---

[5] Brown appears to be extensively relying on a case from the Supreme Court of Wyoming.  *Compare* Statement Grounds Supp. 8–11, *with Asch v. State*, 62 P.3d 945, 961–65 (Wyo. 2003).  This case is not binding on the Court.

4:17-cv-04275-SLD   # 15   Page 11 of 40

so that they would not be—so there is no reason to think that if he had not been required to wear leg restraints, the jury would have found him not guilty.[6] *See Stephenson v. Wilson*, 619 F.3d 664, 671 (7th Cir. 2010) (reaffirming that a petitioner claiming that "his counsel was ineffective in failing to challenge" the decision to physically restrain the petitioner during trial "must show that he was prejudiced by counsel's error," meaning that counsel's "subpar performance harmed" him);[7] *cf. United States v. Cooper*, 591 F.3d 582, 588–89 (7th Cir. 2010) (finding no plain error in a district court's decision to shackle the defendant because there was nothing in the record to suggest "that it affected the outcome of the proceedings," noting that the leg shackles were not visible "because [the defendant] was sitting at a skirted table" and that "the government's table was similarly skirted").

## 2. Right to a Public Trial

Brown argues that counsel was ineffective for "fail[ing] to object to the [C]ourt's statements which affected [Brown's] Sixth Amendment right to a public trial." Statement Grounds Supp. 11–12. Specifically, he argues that counsel "stood idly when the [C]ourt made statements which had the potential of closing the courtroom to spectators." *Id.* at 12. He points to the following statements the Court made at trial: "[W]e've blocked out the windows into the courtroom so nobody can see in here and we have complete control over who enters and who exits," Trial Tr. Volume 3 71:12–15; and "I don't see anybody in the courtroom here today but --

---

[6] Moreover, although Brown briefly suggests that being restrained interfered with his ability to confer with counsel and participate in the trial, *see* Statement Grounds Supp. 9, leg restraints would not have impacted his ability to confer with counsel who was seated right next to him and the Court made accommodations for sidebars where Defendants' presence was necessary and for the removal of leg restraints outside the presence of the jury if Brown chose to testify.

[7] If the decision to restrain a defendant is challenged on direct appeal, the government has "to prove beyond a reasonable doubt that the [restraint] [did] not influence[] the verdict." *Stephenson*, 619 F.3d at 671. This differs from the ineffective assistance of counsel standard, which places the burden on the defendant to show prejudice in the form of an effect on the jury's verdict. *Id.* ("[O]n collateral review of a state court conviction, federal courts . . . only grant[] a writ when an error had a [prejudicial] effect or influence in determining the jury's verdict." (quotation marks and emphasis omitted)).

I mean this afternoon," Trial Tr. Volume 6 1158:20–22, Cr. ECF No. 341.  The Government responds that "at no time during the trial was the courtroom closed to the public."  Resp. 26.

The Sixth Amendment provides defendants with a right to a public trial.  U.S. Const. amend. VI.  This right is "a safeguard against any attempt to employ our courts as instruments of persecution."  *In re Oliver*, 333 U.S. 257, 270 (1948).  Brown's own argument—that the Court's statements had the *potential* to close the courtroom, *see* Statement Grounds Supp. 12—concedes that the courtroom was not actually closed to the public.  No Sixth Amendment violation occurred, and counsel had no duty to object.

Even assuming an attorney would have an obligation to object to potential closures of the courtroom, none happened here.  The Court made the first statement Brown refers to—regarding control over who could exit and enter the courtroom—when discussing the safeguards put in place to prevent jurors from seeing Defendants in leg restraints.  *See* Trial Tr. Volume 3 71:4–15.  The Court was noting that it controlled when the jury and Defendants entered the courtroom; it would always arrange for Defendants to enter first and be seated before the jury came in.  *Id.*

The Court made the second statement—regarding no one being in the courtroom[8]—after a lunch break, but before the jury came back in.  *See* Trial Tr. Volume 6 1140:23–24, 1141:10–12.  The Court was considering a legal issue regarding a witness's testimony.  *See id.* at 1141:13–16.  Nothing in the record supports that the Court barred spectators from entering to listen to that discussion.

---

[8] Presumably this is the statement Brown is referring to.  He cites the trial transcript at page 1158 line 20 which reads in full: "Okay.  One other matter.  And I . . . ."  Trial Tr. Volume 6 1158:20.  The Court finishes, "don't see anybody in the courtroom here today -- I mean this afternoon," in the next two lines.  *Id.* at 1158:21–22.  Shortly thereafter, the Court asked counsel to let spectators know not to mouth words to Defendants.  *Id.* at 1159:1–14.  Even if Brown is referring to this later part of the transcript, the Court's statement did not have the potential to close the courtroom. The Court simply asked counsel to, if they knew the spectators, let them know that it was inappropriate to mouth words to Defendants.  *Id.*  It never indicated it would not allow spectators into the courtroom.

Any objection that either of these statements had the potential of violating Brown's Sixth Amendment right to a public trial would have been frivolous.  Counsel has no duty to make frivolous arguments.  *See Fuller v. United States*, 398 F.3d 644, 652 (7th Cir. 2005) ("Because a defendant's lawyer has an obligation to be truthful and forthright with the court, he has no duty to make a *frivolous* argument . . . ." (quotation marks omitted)); *United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003) ("A defendant's lawyer has, it is certainly true, no duty to make a *frivolous* argument; and there is a tactical reason not to make weak arguments (and *a fortiori* frivolous ones, which anyway are futile): they may distract the court from the strong arguments . . . ." (citation omitted)), *overruled on other grounds by Lockhart v. United States*, 577 U.S. 347 (2016).  Therefore, Brown's counsel did not perform deficiently.

### 3.  Plea Agreement

Brown argues that counsel was ineffective for refusing to negotiate a plea agreement and convincing Brown to go to trial.  Statement Grounds Supp. 12–14.  He alleges that he "notified counsel of his desire to accept a guilty plea to reduced charges . . . with withdrawal of the [G]overnment's sentencing enhancement information[]."  *Id.* at 12.  He alleges that though he directed counsel "to explore a potential plea agreement," counsel refused to do so and told Brown that he would not be found guilty.  *Id.* at 13.  The Government responds that Brown's claim is meritless, citing to an affidavit from his trial counsel, and, alternatively, that Brown has failed to show prejudice because he cannot show that it "would have offered him a plea agreement had his counsel performed differently."  *See* Resp. 27–29.

Counsel submitted an affidavit indicating that, after he was appointed, he consulted with Brown's former attorney, Elliot Zinger.  Taseff Aff. ¶ 15.  Zinger advised him that the only plea offer the Government would make was to mandatory life imprisonment under a cooperation plea

13

agreement.  *Id.*  Counsel relayed this information to Brown and Brown acknowledged that he was aware of the offer and advised that he wanted to go to trial.  *Id.* ¶ 16.  Counsel told Brown to advise him if he ever changed his mind.  *Id.*  Counsel declares that at no time from the start of his representation of Brown until commencement of trial did Brown indicate that he wanted to discuss a plea agreement.  *Id.* ¶ 17.

Brown clarifies in his reply that he "directed trial counsel to discuss a potential plea agreement . . . within days of the trial's commencement *after* the United States filed its § 851 notice" and specifies that he directed counsel that any plea agreement "not include a cooperation agreement."  Reply 11–12, ECF No. 11–11-1 at 6.[9]  It is not clear whether Brown means he directed counsel to negotiate a plea agreement before or after the trial started.  In any case, Brown declared under penalty of perjury that the allegations and statements included in his Statement of Grounds in Support of his 2255 Motion and in his reply are true and correct.  *See* Brown Statement Grounds Supp. Decl., ECF No. 4-1 at 14; Brown Reply Decl., ECF No. 11-1 at 6.  Brown has thus sufficiently alleged facts which, if proven, would show he asked his attorney to pursue plea negotiations.

Even if failure to pursue plea negotiations despite Brown's request could constitute deficient performance, however, Brown has not demonstrated prejudice.  "In the context of pleas[,]  a defendant must show the outcome of the plea process would have been different with competent advice."  *Lafler v. Cooper*, 566 U.S. 156, 163 (2012).  And where, as here, the alleged prejudice is going to trial

> a defendant must show that but for the ineffective advice of counsel there is a
> reasonable probability that the plea offer would have been presented to the court .
> . . , that the court would have accepted its terms, and that the conviction or

---

[9] For some reason, two copies of the reply were filed: first in ECF attachment 11 and the first six pages of ECF attachment 11-1; then again in the remaining pages of ECF attachment 11-1 and ECF attachment 11-2.

> sentence, or both, under the offer's terms would have been less severe than under
> the judgment and sentence that in fact were imposed.

*Id.* at 164.  Brown cannot show that the Government would have offered to allow him to plead

guilty under terms which would have resulted in a sentence of less than life imprisonment and

which he would have accepted.  The only information in the record regarding plea offers is that

the Government would only offer to allow Brown to plead guilty to mandatory life imprisonment

under a cooperation plea agreement, Taseff Aff. ¶ 15, which would allow the Government to

move for a sentence below the mandatory minimum.  Brown denied that offer, *id.* ¶ 16, and

counsel declares that Brown "advised [him] that he would never become a 'snitch' and cooperate

with the feds," *id.* ¶ 16.  And Brown indicates that he directed counsel not to pursue a

cooperation plea agreement.  *See* Reply 12.  The only other plea agreements that would allow

Brown to be sentenced to less than life imprisonment would be a plea to reduced charges or a

plea that provided for withdrawal of the § 851 notice.  But Brown submits no evidence from

which the Court could find that the Government would have offered him these agreements, so he

cannot show prejudice.

### 4.  Shawn Swearingen

Brown argues that counsel was ineffective for "fail[ing] to object when the [C]ourt

interfered with [his] constitutional right to confront and cross-examine [G]overnment witness

Shawn Swearingen."  Statement Grounds Supp. 15.  He acknowledges that "counsel initially

requested permission to question . . . Swearingen about an involuntary manslaughter charge he

received during the late '80s" and that the Court rejected the request.  *Id.*  He argues that

"[c]ounsel's representation was deficient because he neglected to object to preserve this issue for

appellate purposes."  *Id.*  The Government responds that counsel "cannot be deemed ineffective

for making an argument that the Court rejected."  Resp. 30.  This elides Brown's main point

which appears to be that counsel should have objected to the Court's ruling to preserve the issue for appeal.  *See* Statement Grounds Supp. 15; Reply 13.

The Government filed a motion *in limine* to preclude Defendants from impeaching Swearingen based on an alleged murder charge.  Mot. Limine 2–3, Cr. ECF No. 182.  The Court addressed the motion during the trial.  Trial Tr. Volume 5 701:1–707:3, Cr. ECF No. 340.  Swearingen had been convicted of involuntary manslaughter arising out of a car accident in the 1980s where he was driving under the influence.  *See id.* at 701:1–16.  Brown's counsel argued that Swearingen's credibility was central to the case because he "claim[ed] he was beaten by [Defendants] . . . . in response to his not accounting for various drug profits" so the Court should exercise its discretion to allow impeachment of him.  Trial Tr. Volume 5 703:11–18.  But the Court granted the Government's "motion in limine as it relate[d] to the late '80s conviction for involuntary manslaughter."  *Id.* at 706:12–14.  It noted that it was beyond the ten-year time period set by Federal Rule of Evidence 609(b)[10] and was "arguably a juvenile conviction" and concluded that there was "nothing about the nature of that conviction or the circumstances that . . . outweigh[ed] its prejudicial effect or add[ed] really any probative value as to impeachment."  *Id.* at 706:17–707:3.

"To preserve an issue for appeal, an appellant must make a 'timely and specific objection' at trial in order to notify the court and the opposing party of the potential error and the ground for objection."  *United States v. Burns*, 843 F.3d 679, 685 (7th Cir. 2016) (quoting *United States v. Ousley*, 698 F.3d 972, 975 (7th Cir. 2012)).  By opposing the Government's motion *in limine* at trial and making a specific argument for admissibility of Swearingen's involuntary manslaughter conviction, Brown's counsel preserved for the issue for appeal.  Brown's claim

---

[10] Though the Court said Federal Rule of 610(b), *see* Trial Tr. Volume 5 706:17, it meant Rule 609(b).

that counsel was ineffective for failing to preserve the issue for appeal, therefore, must fail: he cannot show deficient performance.

### 5. Perjured Testimony

Brown argues that counsel was ineffective because he "did not object when the [G]overnment intentionally caused its witnesses to provide untrue and prejudicial testimony which [G]overnment counsel knew to be false." Statement Grounds Supp. 16. Specifically, Brown argues that Dorian Thompson, Charmane Perkins,[11] and John Hart lied during their testimony. *Id.* & nn. 10–12 (citing Trial Tr. Volume 3 183:18, 237:2, and 295:9 as to Thompson, citing Trial Tr. Volume 3 311:6, 328:4, and 335:7 as to Perkins, and Trial Tr. Volume 5 952:20 and 1007:10 as to Hart). He also argues that at sentencing the Court "indicated its realization that some of the [G]overnment's witnesses had committed perjury." *Id.* The Government responds that the examples Brown cites "are merely instances of questions and objections made by counsel" and "there is no evidence of perjured testimony given by any of these witnesses, other than Brown's unsupported allegations." Resp. 31. It clarifies that, at sentencing, the Court merely said, "Not every witness was credible, but the majority were, and certainly sufficient to support the offense conduct . . . ." *Id.* (alteration omitted) (quoting Sentencing Hr'g Tr. 234:20–23).

Perjured testimony is false testimony. *See Ashburn v. Korte*, 761 F.3d 741, 757 (7th Cir. 2014). "A prosecutor's knowing use of false testimony violates a defendant's right to due process." *Id.* "Mere inconsistencies in testimony by government witnesses[, however,] do not establish the government's knowing use of false testimony." *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990).

---

[11] Charmane Perkins's married name is Charmane Roddy, Trial Tr. Volume 3 304:1–2, but she was primarily referred to as Charmane Perkins at trial, so the Court uses that name here too.

Brown's counsel did argue that one of the identified witnesses perjured himself. Brown points to a portion of the trial transcript where all of Defendants' attorneys moved to strike Hart's testimony. *See* Trial Tr. Volume 6 1007:10–1009:13, 1010:14–19. Hart testified that he received no benefit from becoming a confidential source, *see* Trial Tr. Volume 5 946:19–21, and that when he decided to become a confidential source, he was not already at the Kewanee Police Department because he had been arrested, *id.* at 945:24–946:3. But the Government had provided information to the defense that Hart had been "caught with a crack pipe during a traffic stop and agreed to cooperate immediately." Trial Tr. Volume 6 1008:12–13. Defense counsel argued that Hart had perjured himself because he was arrested and he did receive a benefit for his cooperation—not being charged based on the traffic stop—and the Government failed to correct Hart's testimony, as was its obligation; accordingly, they moved to strike Hart's testimony. *See id.* at 1008:18–1009:13. The Government responded that Hart's testimony was not false because he testified that there were many reasons he decided to cooperate and that an arrest was one of them. *Id.* at 1010:22–1011:1; *see also* Trial Tr. Volume 5 945:5–8 (A: "There was a multitude of reasons why I went [to the police station to sign a confidential source agreement]. Q: Was your arrest one of them? A: Along with an arrest at, at some point."). The Government also pointed out that defense counsel could have impeached Hart with the information. Trial Tr. Volume 6 1011:2–10. The Court found that Hart had not perjured himself but rather had merely given inconsistent statements and expressed an opinion (about whether he received a benefit). *Id.* at 1151:4–19. Thus, counsel made the argument Brown wanted him to have made and the Court disagreed that Hart perjured himself. Counsel cannot be deemed to have performed deficiently.

With respect to the other part of Hart's testimony Brown points to[12] and the other identified testimony,[13] the Court agrees with the Government that Brown presents no evidence to suggest there was perjury.  Brown merely cites various parts of Thompson, Perkins, and Hart's testimony and asserts that the witnesses perjured themselves.  His mere assertion that there was perjury does not prove that any testimony was false, let alone that the United States knew any testimony was false.  Counsel cannot be deemed to have performed deficiently for failing to make frivolous objections.  *See Fuller*, 398 F.3d at 652; *Rezin*, 322 F.3d at 446.

---

[12] The other part of Hart's testimony that Brown points to is an exchange Hart had with a Co-Defendant's counsel regarding a robbery conviction.  *See* Trial Tr. Volume 5 952:20–954:4.  Nothing about this exchange suggests Hart perjured himself.

[13] With respect to Thompson, Brown first points to his testimony that he was "not confident [he was] getting a time cut."  Trial Tr. Volume 3 183:18–20.  Nothing about the cited portion of the transcript suggests Thompson perjured himself.  Second, he points to the beginning of a back-and-forth Thompson had with a Co-Defendant's counsel on cross-examination.  *See id.* at 237:2.  Thompson read a statement from his plea agreement—that if his offense level under the United States Sentencing Guidelines was above 16, he would qualify for an additional one-point reduction because he timely notified the United States Attorney's office of his intention to plead guilty—and affirmed that he read it before he signed the agreement.  *Id.* at 237:3–17.  Counsel suggested that this was based on a false premise because the United States did have to prepare for a trial.  *Id.* at 238:4–9.  Thompson was charged with both conspiracy to distribute crack cocaine and possession of crack cocaine.  Superseding Indictment, *United States v. Thompson*, 4:11-cr-40054-JBM-JAG-1 (ECF No. 8).  After the first day of trial, his attorney filed a motion for a directed verdict regarding the conspiracy charge.  Mot. Directed Verdict, *United States v. Thompson*, 4:11-cr-40054-JBM-JAG-1 (ECF No. 43).  The next day, the parties announced they had reached a plea agreement: Thompson would plead to the possession charge and the United States would dismiss the conspiracy charge.  Nov. 20, 2012 Min. Entry, *United States v. Thompson*, 4:11-cr-40054-JBM-JAG-1.  Thompson explained at Brown's trial that he had always intended to plead guilty to the possession charge, Trial Tr. Volume 3 239:8–9; indeed, he signed a proffer letter on May 17, 2012, months before the trial began, *see id.* at 244:3–7.  In any case, nothing about the portion of the trial transcript Brown points to suggests that Thompson perjured himself.  Third, Brown points to an exchange between Government counsel and Thompson where Thompson explained that he understood that the Government would have to file a motion to reduce his sentence below the mandatory minimum but ultimately it would be up to the sentencing judge to determine his sentence.  *Id.* at 295:4–23.  The Court sees no inconsistencies, let alone any evidence of falsity, in these statements.  With respect to Perkins, Brown first points to her testimony regarding a recording made on February 1, 2012.  *See id.* at 311:6–8.  The Court fails to understand what portion of this testimony Brown believes contains any falsity or inconsistency.  Second, Brown points to Perkins's testimony that she did not recognize one of the Government's exhibits.  *See id.* at 328:4–6.  She testified that she recognized it as crack but testified that the particular crack was not what she bought.  *Id.* at 328:10–16.  He also points to her testimony on cross-examination that the Government's exhibit was not what she gave to law enforcement after a controlled buy.  *See id.* at 335:7–9.  Her testimony that she did not recognize the crack cocaine does not suggest she was lying.  (Indeed, it appears the crack she was shown was "mashed up" whereas when she bought it, "[i]t was all in one big chunk."  *Id.* at 328:17–20.)

### 6.  Testimony about Fear of Petitioner

Brown argues counsel was ineffective for failing to object when Tanya Clayton testified that she and others were scared of Brown.  Statement Grounds Supp. 16–17.  Brown argues that this testimony was "irrelevant, immaterial, inflammatory and prejudicial," was given without a proper foundation, and "caused substantial bias toward" him.  *Id.* at 17.  He argues counsel should have "urge[d] the Court to conduct the balancing test mandated by Rule 403 of the Federal Rules of Evidence."  Reply 15.  The Government responds that Defendants' attorneys did object to several of the questions asked of Clayton.  Resp. 32.  Moreover, it argues that Clayton's "fear of and intimidation by Brown was an integral reason for her continued participation" in Defendants' criminal enterprise.  *Id.*

Clayton testified about her involvement with Defendants.  For example, she bought crack from them, *see, e.g.*, Trial Tr. Volume 6 1041:14–1043:8, they stayed at her house, *id.* at 1051:24–1052:2; and she drove them to deliver drugs, *id.* at 1052:5–7.  She also testified that she was scared of and threatened by Coleman and Brown.  Specifically, she testified that Coleman and Brown "would threaten to take [her] freedom, threaten to take [her] children, scare [her]" and told her never to talk to police.  *Id.* at 1089:14–16.  She testified that Brown told her thirteen-year-old daughter "that if she ever said anything that he would put a bullet between her eyes and put her body in the woods."  *Id.* at 1092:4–8.  Clayton explained that she "was very scared of them," *id.* at 1092:12, and they "would just threaten" her when she tried to argue, *id.* at 1092:10–11.  She further testified about an incident where she saw Government witness Shawn Swearingen cry: She and Swearingen took a ride in her Jeep and "he cried so hard because they[, Coleman and Brown,] had beat him up so bad, and he was hurt, and he was scared."  *Id.* at 1094:18–1095:3.  She also testified that a person named Chris—referring to Tatum, *see* Trial Tr.

20

Volume 6 1121:7–11; Trial Tr. Volume 9 2044:9–11, Cr. ECF No. 344, who was charged with Defendants but pleaded guilty—was "very afraid of" Coleman and Brown.  Trial Tr. Volume 6 1096:3–5.[14]

Foundation objections were made as to some of the testimony.  *See id.* at 1090:12 (objection to Brown's alleged threat to Clayton's daughter); *id.* at 1095:15–19 (objection to testimony about Chris, Coleman, and Brown's relationship).  But the Government was able to provide the proper foundation.  *See id.* at 1090:23–1091:20; *id.* at 1095:21–1096:2.  Brown does not specifically identify what other testimony lacked foundation, and the Court does not believe any further objections would have been warranted.  In any case, the failure to make them would have caused no prejudice because Government counsel could simply have asked more questions to establish the proper foundation.  Brown does not specify what testimony he believes was hearsay.  Any testimony about threats Brown or Coleman made were admissible as statements of a party opponent and statements of coconspirators.  *See* Fed. R. Evid. 801(d)(2)(A), (E).

It is true that no objection was made to Clayton's testimony under Federal Rule of Evidence 403.  Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  As the Government notes, however, the testimony was relevant: Clayton was present for much of Defendants' day-to-day drug dealing and she participated in the conspiracy.  *See* Resp. 32; *id.* at 9 ("Coleman and Brown frequently relied on violence and intimidation to maintain control over the operation and prevent individuals from contacting law enforcement.").  The testimony about Swearingen's beating[15]

---

[14] Brown also points to testimony that was elicited by his counsel on cross-examination.  Statement Grounds Supp. 17 (citing Trial Tr. Volume 6 1110:8–9).  As Brown's counsel elicited the testimony, and it was responsive to his question, he could not object to it.

[15] Indeed, Swearingen testified about his beating, *e.g.*, Trial Tr. Volume 5 772:1–3, and Brown does not challenge that testimony.

and Chris being afraid of Brown and Coleman were similarly relevant.  *See* May 9, 2013 Mot.

Hr'g Tr. 4:13–7:17, Cr. ECF No. 285 (denying a Co-Defendant's motion *in limine* to preclude

testimony about Swearingen's beating because it was "direct evidence of the underlying offense"

and "help[ed] establish the respective roles of the [C]o-[D]efendants as well as the, the means

and methods in which their conspiracy conducted itself").  Evidence of the threats against

Clayton, specifically, were also relevant to her credibility.  *United States v. Hunter*, 932 F.3d

610, 621 (7th Cir. 2019) ("We previously have held that evidence of threats by a defendant

against a prosecution witness on direct examination is inadmissible unless it is linked to a

specific credibility issue at trial—like a witness's behavior on the stand or testimony that is

inconsistent with prior statements.").  Defense counsel cross-examined Clayton and attempted to

show that she was not a credible witness due to her addiction and because she did not report

incidents to the police, *see* Trial Tr. Volume 6 1109:16–1110:8, and because she did not fully

cooperate right away, *id.* at 1131:19–11332:18, among other avenues of cross-examination.

Though there was likely some prejudicial effect considering the nature of the threats, the danger

of unfair prejudice would not substantially outweigh the probative value of the evidence.

Counsel did not perform deficiently by failing to object to this testimony and, even if he had,

there was no prejudice under *Strickland*.  The evidence against Brown was overwhelming even

absent the testimony about his threats, assault, and intimidation.

### 7.  Gratuities to a Witness

Next, Brown argues that counsel was ineffective for "failing to object when

governmental testimony revealed the [Government] had provided financial compensation to drug

addicts for the purpose of assisting with the arrest of petitioner."  Statement Grounds Supp. 19.

The Government merely argues that this claim is undeveloped because Brown failed to identify

22

"what gratuities were paid or even which witnesses he claims were given financial compensation."  Resp. 34.  In his reply, Brown identifies Perkins as a witness who had been provided financial assistance.  Reply 16 (citing Trial Tr. Volume 3 308:9).  Perkins testified that she "agree[d] to provide cooperation in exchange for monetary payment."  Trial Tr. Volume 3 308:9–13.  Essentially, Brown argues the Government improperly purchased Perkins's testimony.  Reply 16.

Brown points to no law to support his argument that it is improper for the Government to use paid confidential informants.  There is a statute, 18 U.S.C. § 201(c)(2), that prohibits giving "anything of value to any person, for or because of [that person's] testimony."  But it appears that Perkins's payment was for her assistance in conducting a controlled buy, not for her testimony at trial.  *See* Trial Tr. Volume 3 331:19–22 (testifying that she received either $50 or $100 for setting up a controlled buy); *United States v. Dawson*, 425 F.3d 389, 393–34 (7th Cir. 2005) (finding that a "bounty"—here, a payment to a cooperator for helping law enforcement catch the defendants—was different than a witness fee).  In any case, the Seventh Circuit has held that § 201(c)(2), which is a criminal statute, "does not exclude evidence or provide a basis for individual remedies."  *United States v. Febus*, 218 F.3d 784, 796 (7th Cir. 2000).  Even if it did, the court has found that paying an informant is "not *per se* outrageous; rather the jury may consider [the payment] as evidence relating to the informant's credibility."  *Id.* (quotation marks omitted); *see also Dawson*, 425 F.3d at 395 ("Our job, so far as it bears on whether [the cooperating witness who received a monetary benefit for helping law enforcement] should have been excluded from testifying at all, is to make sure that grossly unreliable evidence is not used to convict a defendant.  We do this by requiring (in effect) that the inducements be disclosed to

23

the jury.").[16]  And here, the jury heard that Perkins received compensation for her cooperation and that she believed she received either $50 or $100.  Any objection to Perkins's testimony on this basis would have been frivolous, and counsel does not have a duty to make frivolous objections.  *See Fuller*, 398 F.3d at 652; *Rezin*, 322 F.3d at 446.

### 8.  Ultimate Opinion

Brown argues that counsel was ineffective because he "neglected to object when a prosecution witness provided testimony which concerned the ultimate issue and intruded upon the jury's province."  Statement Grounds Supp. 19–20.  Brown is referring to Perkins's testimony that she knew Brown because he was a drug dealer and he sold her drugs.  *Id.* at 20 (citing Trial Tr. Volume 3 315:2–11).  The Government responds that Perkins "was testifying as to her personal knowledge and relationship with Brown" and Coleman and argues "[t]here was nothing improper about the line of questioning."  Resp. 35.  In his reply, Brown argues that Perkins's testimony violated Federal Rule of Evidence 701(b).  Reply 16.

A lay witness—as opposed to an expert—can testify as to an opinion so long as it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge."  Fed. R. Evid. 701.  "[A]n opinion is not objectionable just because it

---

[16] Other courts have specifically held that § 201(c)(2) does not prohibit payments to informants for assisting law enforcement "so long as the payment is not for or because of any corruption of the truth of testimony."  *See, e.g.*, *United States v. Anty*, 203 F.3d 305, 311 (4th Cir. 2000); *United States v. Harris*, 210 F.3d 165, 167–68 (3d Cir. 2000).  These courts explain that "[t]he use of informants to uncover criminal conduct and to prosecute violators is a long-standing and established practice" and § 201(c)(2) was not meant to bar this long-standing practice.  *Anty*, 203 F.3d at 310–11.  So far as the Court can tell, the Seventh Circuit has not addressed this issue directly.  In *United States v. Condon*, 170 F.3d 687, 688–89 (7th Cir. 1999), the Seventh Circuit decided that § 201(c)(2) did not prohibit testimony from witnesses promised immunity in exchange for cooperation because immunity was not a thing of value.  The court suggested that § 201(c)(2) could not be read to allow "prosecutors to pay cash for favorable testimony" but did not address the question of whether informants who received payment for their cooperation in investigations could testify about that cooperation.  *Id.* at 689; *see Harris*, 210 F.3d at 168 (suggesting that *Condon* reserved the question of "whether [§ 201(c)(2)] allows the government to pay a witness solely or essentially for favorable testimony, as distinct from paying a witness for collecting evidence and testifying about what was found").

embraces an ultimate issue." *Id.* at 704. To the extent Brown thinks his counsel should have objected to Perkins's testimony because it concerned an ultimate issue, then, that objection is clearly frivolous under Rule 704.

To the extent he thinks counsel should have objected to the testimony under Rule 701(b), the objection still would have been frivolous. Brown does not explain why he thinks Perkins's testimony that he was a drug dealer—assuming this is even opinion testimony—was not "helpful to clearly understanding [her] testimony or to determining a fact in issue," *see id.* at 701(b). As the Government points out, she was testifying about how she knew Brown and Coleman, which is certainly helpful to understanding her testimony about her interactions with them. As counsel has no obligation to make frivolous arguments, he did not perform deficiently. *See Fuller*, 398 F.3d at 652; *Rezin*, 322 F.3d at 446.

### 9. Controlled Buys

Brown argues that counsel was ineffective for "fail[ing] to object when individual witnesses testified a buy was being controlled by law enforcement where there was a lack of foundation offered, or, alternatively, testimony clearly and completely refuted the [G]overnment's assertion(s)." Statement Grounds Supp. 21. He points to various points in the trial transcript which he asserts "demonstrate[] that all of the *buys* were not controlled." *Id.* (citing, for example, Trial Tr. Volume 3 321:6). The Government responds that "Brown does not explain why he asserts that law enforcement did not 'control' the purchases, and further does not provide any evidence other than his statement that calling the monitored purchases 'controlled' sent the message to the jury to place additional credibility to those purchases." Resp. 37. Brown's reply elaborates on his argument somewhat. For example, he suggests that Perkins's February 1, 2012 buy was not controlled because "she walked to the police station to

25

drop off the crack." Reply 18.  He argues that there was no evidence to show that law enforcement initiated the buy, that the purchase was monitored by law enforcement, or that the confidential source was searched before and after the purchase by law enforcement.  *Id.* at 19. He argues "counsel was obligated to object . . . where evidence did not show the buy was *completely controlled* by law enforcement personnel." *Id.*

The Court is not aware of any legal basis for objecting to the use of the phrase "controlled buy" to describe a purchase of drugs set up by law enforcement or a set of parameters that must be met before a purchase of drugs may be referred to as a controlled buy.[17] Any aspect of the purchase that was not controlled by law enforcement would instead be fodder for cross-examination and argument.  The objection Brown wants his counsel to have made would be frivolous, so counsel did not perform deficiently by not making it.  *See Fuller*, 398 F.3d at 652; *Rezin*, 322 F.3d at 446.

### 10. Leading Questions

Brown argues his counsel was ineffective for failing to object when the Government asked some of its witnesses "leading questions which resulted in those particular witnesses giving prejudicial answers."  Statement Grounds Supp. 22–23.  He argues counsel should have objected under Rule 403.  *Id.*  Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  The Government responds that the questions and answers

---

[17] The cases the Court could find that addressed whether a controlled buy was properly executed involved whether there was probable cause for a search or arrest.  *See, e.g.*, *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2005).  Even in these cases, some lack of control—in *Sidwell*, for example, police were not able to see the confidential informant after he entered an apartment building to purchase drugs—did "not negate the existence of probable cause." *Id.*

26

Brown points to "provide nothing to raise unfair prejudice, mislead the jury, cause delay or present cumulative evidence" and "therefore[] [were] not subject to being excluded . . . under Rule 403." Resp. 38.

Brown points first to the testimony of Officer Doug Wade, Statement Grounds Supp. 22 (citing Trial Tr. Volume 3 353:13, 359:11), an "inspector with the Illinois State Police Black Hawk Area Task Force," Trial Tr. Volume 3 345:12–13. Wade testified that he assisted with surveillance of a confidential source in connection with a controlled buy on October 18, 2011. *See id.* at 351:14–352:1. He testified that he set up an audio recording device and a video recording device. *Id.* at 353:3–5. The Government asked: "Where was the video recording device placed?" *Id.* at 353:13. He responded, "It was placed in the vehicle." *Id.* at 353:14. This was not a leading question and the answer was not subject to being excluded under Rule 403. He later testified that on October 18, 2011, he came into possession of controlled substances. *Id.* at 358:18–23. He testified that he "was provided the exhibit from [another officer] to transport . . . back to the Illinois State Police headquarters and place that into secured holding." *Id.* at 358:25–359:3. The Government then showed him an exhibit and asked if he recognized it, which he said he did. *Id.* at 359:4–7. He testified that the exhibit was "approximately .4 grams of purported cocaine" and the exhibit had his signature on it. *Id.* at 359:9–10. The Government then asked: "So, that's the crack cocaine that [the other officer] gave you after the October 18th controlled buy with [the confidential source] that you took back to place in secured storage?" *Id.* at 359:11–14. Wade responded: "That is correct." *Id.* at 359:15. The Government's question was leading, but leading questions are not flatly prohibited. *See United States v. Cephus*, 684 F.3d 703, 707 (7th Cir. 2012); Fed. R. Evid. 611(c). Leading questions are permissible if "used with friendly witnesses to move direct examination along rather than to elicit testimony damaging to

the opposing party that the witness might not have given in response to a neutral question." *Cephus*, 684 F.3d at 707.  Wade testified he was given drugs to put into holding and that he recognized the drugs; the Government's question merely put the pieces together and moved the examination along.  And in any case, Wade's identification of the exhibit as the cocaine recovered from the October 18, 2011 controlled buy is not subject to exclusion under Rule 403.

Next, Brown points to testimony from Loretta Empson.  *See* Statement Grounds Supp. 22 (citing Trial Tr. Volume 4 413:5, Cr. ECF No. 339).  Empson testified that she bought crack from Defendants.  *See* Trial Tr. Volume 4 391:9–11 (Coleman); *id.* at 393:12–14 (Brown); *id.* at 395:13–15 (Clark); *id.* at 396:8–10 (Capers).  She testified that she sometimes bought $20 worth of cocaine a day from the Defendants, sometimes $50 worth a day, and sometimes $100 worth a day.  *Id.* at 397:20–398:5.  She testified that Coleman, Capers, and Brown would occasionally stay at her house.  *See id.* at 411:12–14, 24–25.  She was asked, "[W]ould you receive anything in return for that?" to which she responded, "Sometimes."  *Id.* at 412:18–20.  The Government then asked her what she would receive.  *Id.* at 412:21.  She testified: "[W]hen I didn't have any more money, I still wanted more stuff so I'd go down and wake them up, say, Hey, give me something.  They'd – Nope, can't do it.  Then I'd get mad and kick them out of the house and whatever."  *Id.* at 412:22–413:3.  The Government then asked if she was referring to crack and if she sometimes would receive crack; she affirmed that that is what she meant.  *Id.* at 413:5–7. The Government's questions, "And so are you talking about crack? Sometimes you would receive crack?" *id.* at 413:5–6, were not leading but rather clarifying what Empson had just testified to.  And in any case, her response that she meant crack was not unfairly prejudicial, cumulative, misleading, or otherwise subject to exclusion under Rule 403.

Lastly, Brown points to the testimony of Stephanie Mullins.  *See* Statement Grounds Supp. 22 (citing Trial Tr. Volume 4 582:5).  The Government asked her if she "ever ha[d] any business dealings with [Brown.]"  Trial Tr. Volume 4 582:2–3; *see id.* at 582:10–583:6 (identifying Brown as the man she was testifying about).  She said, "Yes," *id.* at 582:4, and the Government asked, "And what did you buy from [Brown]?" *id.* at 582:5.  She responded: "It was crack cocaine."  *Id.* at 582:6.  The Government's question about what she bought from Brown was not a leading question.  Moreover, the Government had previously explained that when it asked whether she had any business dealings with a person, it meant whether she bought anything from the person.  *Id.* at 578:6–8.  And Mullins's answer was not unfairly prejudicial, cumulative, misleading, or otherwise subject to exclusion under Rule 403 either.

None of the objections Brown wishes his counsel would have made have any basis.  Counsel did not perform deficiently by failing to make these frivolous objections.  *See Fuller*, 398 F.3d at 652; *Rezin*, 322 F.3d at 446.

### 11. Speculative Testimony

Brown argues that his counsel was ineffective because "he did not adequately contest the [G]overnment's use of witness testimony which was based on speculation."  Statement Grounds Supp. 23–24.  Specifically, he points to portions of Empson's testimony.  *Id.* at 24 (citing Trial Tr. Volume 4 404:23, 405:12, 430:12, 430:20).  The Government argues that the record belies this claim, Resp. 39, and that Brown cannot show prejudice with respect to this allegation because the evidence of his guilt was overwhelming, *id.* at 40 ("Discounting a portion or even all of any witness's testimony would not have changed the outcome of the trial.").

Brown first points to the following question the Government asked Empson:  "You mentioned that these gentlemen[, Defendants,] were from Chicago.  Do you know – if you know,

do you know why they came to Kewanee?"  Trial Tr. Volume 4 404:23–25.  A Co-Defendant's counsel objected on the basis that this called for speculation.  *Id.* at 405:1.  The Court sustained the objection.  *Id.* at 405:2.  The Government then asked, "Do you know, ma'am?  Yes, or no?  Do you know why?"  *Id.* at 405:4–5.  Empson responded: "To sell crack cocaine, to make money."  *Id.* at 405:6.  The Government followed up with, "Did any of the defendants tell you what brought them to Kewanee?"  *Id.* at 405:7–8.  She responded: "No.  I don't know where or how they come there."  *Id.* at 405:9–10.  Brown's counsel then objected and moved to strike Empson's answer that they came to Kewanee to sell crack.  *Id.* at 405:11.  The Court sustained the objection, pointing out that it "sustain[ed] the [first] objection about speculation" and then the Government "asked her the same question."  *Id.* at 405:12–14.  The Court informed the jury: "[T]he question [to] which I sustained the objection is, Do you know why they came to Kewanee? You're to strike the answer to that question.  In other words, you're not to consider that or any of the subsequent questions in considering the evidence in this case."  *Id.* at 405:16–22.  Brown argues that his counsel "did not object when the court did not issue a cautionary instruction, nor did counsel move to strike the response."  Statement Grounds Supp. 24.  But in fact counsel did object when the Government asked the question again, he did move to strike the response, and the Court did instruct the jury not to consider the response.

Brown then points to a portion of Empson's testimony where she said that Defendants would "send [her] to Wal-Mart to get baggies" and would give her "enough money if [she] needed anything, like paper towels, toilet paper, stuff like that."  Trial Tr. Volume 4 430:8–11.  The Government asked, "Did you need baggies?" *id.* at 430:12, to which she responded, "No. . . . They wanted the baggies," *id.* at 430:13–15.  The Government asked, "Why; do you know?" *Id.* at 430:16.  She responded, "Probably to bag up."  *Id.* at 430:17.  The Government then asked her

what that meant and she explained that she meant "[b]ag up their crack." *Id.* at 430:18–19.  She

then testified that she believed they bagged up in her basement.  *Id.* at 430:24–431:2.  A Co-

Defendant's counsel then objected on the basis that she was speculating, *id.* at 431:4, apparently

at the same time the Government began to ask Empson what the basis for that belief was, *id.* at

431:3.  The Court sustained the objection and instructed the Government to finish asking its

question.  *Id.* at 431:5–6.  Empson then explained the basis for her belief.  *Id.* at 431:8–25.

While there was an objection to the speculation that Defendants bagged up their crack in

Empson's basement, there was no objection to her speculation that Defendants wanted her to buy

bags at Wal-Mart to bag up their crack.  But the Court is not inclined to find that counsel

performed deficiently by failing to object to that testimony; it is a commonsense inference and

was likely a matter of strategy not to object.  Indeed, counsel objected to other portions of

speculative testimony.  Moreover, Brown cannot show prejudice from counsel's failure to object

to that testimony.  If the Court had struck Empson's testimony that Defendants wanted her to buy

baggies so they could bag up their crack, there would still be significant evidence from which a

jury could find Brown guilty.

### 12.  Summary Testimony

Brown argues that his counsel was ineffective because he failed to object to testimony

from case agent Nick Welgat as prejudicial summary testimony.  Statement Grounds Supp. 26.

He argues that Welgat was allowed to "bolster and/or corroborate testimony of previous

witnesses."  *Id.*  He does not identify any specific portions of Welgat's testimony to which his

counsel should have objected.  The United States responds that defense counsel objected 25

times during Welgat's testimony.  Resp. 43.  Further, it argues that "[t]here is no evidence other

31

than Brown's unsupported allegation that Welgat's testimony only bolstered or corroborated earlier testimony of other witnesses." *Id.*

A review of the record demonstrates that Brown's counsel objected where Welgat's testimony or evidence tended to bolster the other witnesses' testimony and nothing else in his testimony was worthy of such an objection.  At the time he testified, Welgat worked for the Kewanee Police Department but was "assigned as an inspector with the Illinois State Police Black Hawk Area Task Force."  Trial Tr. Volume 10 2415:7–17, Cr. ECF No. 345.  As the case agent, he "conducted several interviews with witnesses, informants," "conducted several controlled purchases," "conducted surveillance . . . during controlled purchases[,] and participated in search warrants and arrests of individuals involved in th[e] case."  *Id.* at 2416:16–23.  He testified about those activities.

At one point, Government counsel asked Welgat about a summary he prepared of the controlled buys he participated in.  *See id.* at 2446:25–2447:8.  A Co-Defendant's counsel then called for a sidebar.  *Id.* at 2447:23.  Brown's counsel argued that the summary "bolster[ed] the testimony of the various witnesses as to what transpired" during the controlled buys.  *Id.* at 2450:16–18.  He argued that Welgat testifying that the summary was "fair, true and accurate based upon [Welgat's] understanding of the evidence" presented at trial would be "an unfair opinion . . . that [would] bolster[] the credibility of some very shaky people."  *Id.* at 2450:19–23; *id.* at 2451:22–24 ("The witness is essentially putting his seal of approval on this as accurate. That's bolstering.").  The Court ruled that "[b]ecause there ha[d] been conflicting testimony regarding some of the evidence" that was reflected in the summary chart, it was "inappropriate that it be admitted into evidence."  *Id.* at 2452:5–9.

In another portion of his testimony, Welgat discussed "summar[ies] [he made] of the phone calls pertinent to the investigation." *See id.* at 2453:21–2454:20. After a foundation was laid, 2454:21–2457:20, and Brown's counsel asked questions regarding how the summary was made, *id.* at 2458:8–2459:16, the summaries were admitted, *id.* at 2458:18. After he testified about what the summaries meant, the Government asked Welgat: "[W]hat do these phone tolls and summaries you provided tell you about the communications between your [confidential sources] and these numbers?" *Id.* at 2465:8–10. Welgat responded: "This information here corroborates what the confidential informants have told us, that they have had contact." *Id.* at 2465:11–13. Brown's counsel objected to that testimony "as being pure bolstering and improper opinion" and asked for the answer to be stricken. *Id.* at 2465:14–15, 18. The Court sustained the objection and instructed the jury not to consider Welgat's answer. *Id.* at 2465:16, 19–21.

Thus, Brown's counsel did object to an exhibit and a portion of Welgat's testimony as improper bolstering and the Court sustained those objections. Counsel will not be deemed ineffective for failing to make further unspecified objections.

### 13. Sentencing Enhancement

Brown argues that counsel was ineffective because he did not object to the Government's filing of an amended notice pursuant to 21 U.S.C. § 851 after his trial but before his sentencing. Statement Grounds Supp. 27–28. Brown argues that the Government "violated [his] right to due process" because the amended notice changed "the convictions the [G]overnment was relying upon for sentencing purposes," that the Government violated 21 U.S.C. § 851(e) because it was not correcting a clerical error, and that he was prejudiced "because he was sentenced to [l]ife imprisonment pursuant to a sentencing information which was untimely," *id.* at 27–28. The Government responds that Brown suffered no prejudice because "the initial notice . . . contained

more than the required two prior felony drug convictions."  Resp. 45.  Brown replies that the
Government "abandon[ed] the [initial] § 851 notice" when it filed a new one and that he was
entitled to know the specific convictions the Government was relying on.  Reply 23.

At the time Brown was sentenced, 21 U.S.C § 841(b)(1)(A) (effective Aug. 3, 2010 to
Dec. 20, 2018), imposed a mandatory minimum sentence of ten years of imprisonment.  If the
person convicted under the statute had "two or more prior convictions for a felony drug offense,"
he faced a mandatory life sentence.  *Id.*  For an enhanced mandatory minimum under § 841 to
apply, the Government must "before trial . . . file[] an information with the court (and serve[] a
copy of such information on the person or counsel for the person) stating in writing the previous
convictions to be relied upon."  21 U.S.C. § 851(a)(1).  "Clerical mistakes in the information
may be amended at any time prior to the pronouncement of sentence."  *Id.*

The Government filed a § 851 notice for Brown on May 10, 2013.  Not. Intent Rely, Cr.
ECF No. 179.  The notice listed seven prior drug offenses.  *Id.* at 1.  On November 21, 2013,
after trial but before sentencing, the Government filed an "amended notice to correct clerical
mistakes in the [G]overnment's previously filed notice."  Am. Not. Intent Rely 1, Cr. ECF No.
228.  It deleted one of the convictions from the list and corrected the date and case number of
another.  *Id.* at 2.  The following day, the Government filed another "amended notice to correct
clerical mistakes in the [G]overnment's previously filed notices."  Second Am. Not. Intent Rely
1, Cr. ECF No. 230.  In that amended notice, the Government added another conviction.  *Id.* at 2.

While Brown's counsel objected to Brown being sentenced to mandatory life
imprisonment because the Government did not "plead and prove [the] prove the prior
convictions," Sentencing Hr'g Tr. 47:15–16, he did not object to reliance on the amended notices
that were filed post-trial.  But even if it could be considered deficient performance not to object

to the amended notices on the basis that they were untimely and contained more than clerical corrections,[18] Brown can show no prejudice.  He had far more than the required two convictions. Six of the convictions the Government relied on—four more than qualified him for the enhanced penalty—were in each of the notices.  And even if the Court had struck the amended notices, Brown still would have been subject to mandatory life imprisonment under the initial notice.

### 14. Cumulative Prejudice

When deciding whether a counsel's errors prejudiced a petitioner, courts are to consider the cumulative prejudicial effect of the counsel's errors rather than only analyzing the prejudicial effect of individual errors.  *See Myers*, 975 F.3d at 623; *Washington*, 219 F.3d 620 at 634−35.

Brown has not convinced the Court that his counsel made many, if any, errors.  The Court addressed prejudice—assuming for purposes of the motion that Brown could show deficient performance—only with respect to some of the grounds.  *See supra* Section I(b)(i)(1), (3), (6), (11), & (13).  For some of these, the Court found that Brown demonstrated no prejudice at all.  For instance, he demonstrated no prejudice from counsel's failure to pursue plea negotiations because he did not show that the Government would have offered him a plea agreement on terms he would accept which would have allowed him to be sentenced to less than life imprisonment.  *See supra* Section I(b)(i)(3).  Likewise, he demonstrated no prejudice from

---

[18] "An error is considered a clerical mistake 'as long as the information serves to convey the Government's intent to seek an enhancement based on a particular earlier conviction.'"  *United States v. Pirtle*, 333 F. App'x 108, 110 (7th Cir. 2009) (quoting *United States v. Curiale*, 390 F.3d 1075, 1076−77 (8th Cir. 2004)).  The first amended notice was proper.  It removed a conviction that was clearly a misdemeanor charge.  *See* Am. Not. Intent Rely 2.  And it corrected a date that was merely an estimate at first and added two missing digits to a case number.  *Id.*; *see Curiale*, 390 F.3d at 1077 (finding that listing a crime as "sale rather than possession of illegal drugs was a clerical mistake capable of correction by amendment under § 851(a)(1)"); *United States v. Arreola-Castillo*, 539 F.3d 700, 704 (7th Cir. 2008) (finding that listing the wrong jurisdiction was a clerical error and suggesting that listing an incorrect year of conviction is a clerical error).  But the second amended notice added a new conviction; it did not clarify the dates, case number, jurisdiction, charge, or some other information regarding a conviction that was already listed.  *See* Second Am. Not. Intent Rely 2.  So perhaps counsel should have objected to the second amended notice.

counsel's failure to object to the amended § 851 notices because even if the Court struck them, the initial § 851 notice listed more than enough convictions to qualify Brown for a mandatory life sentence.  *See supra* Section I(b)(i)(13).  And he failed to demonstrate any prejudice from not being at the hearings discussing restraints or from having to wear restraints.  *See supra* Section I(b)(i)(1).

Counsel's alleged errors at trial, however, could have a combined prejudicial effect. Evidence and witness testimony erroneously unchallenged at trial may not individually affect the outcome of the trial but may work together to do so.  Thus, the Court must consider the collective impact of counsel's failure to have Clayton's testimony about her and others' fear of Brown and the speculative testimony about why Defendants wanted Empson to buy bags excluded or stricken from the record.  Even considered together, the Court finds that Brown has not shown a reasonable probability that, had counsel not made these alleged errors, the jury would have found him not guilty.  If Clayton had not been allowed to testify that people were afraid of Brown and had Empson been stopped from speculating about why Defendants wanted bags, there still would have been overwhelming evidence against Brown, including testimony about numerous controlled buys from witnesses and law enforcement, phone records, wire transfer records, and witness testimony about Defendants' drug dealing operation.

### ii.  Appellate Counsel

#### 1.  Failed to Raise the Above Issues on Appeal

Brown argues that his appellate counsel was ineffective for failing to raise the above-identified issues on appeal.  Statement Grounds Supp. 28–29.  The Government argues that counsel was not required to raise every issue requested by Brown and that he cannot show prejudice because all of his claims are meritless.  Resp. 46–47.

"[C]ounsel is not required to raise every non-frivolous issue on appeal." *Martin v. Evans*, 384 F.3d 848, 852 (7th Cir. 2004). "An appellate counsel's performance is deficient if he or she fails to argue an issue that is both obvious and clearly stronger than the issues raised." *Id.* at 851. Brown's appellate lawyer raised numerous issues: first, that summaries of wire transfer transactions were inadmissible, *Brown*, 822 F.3d at 971–73; second, that admission of those summaries violated his Confrontation Clause rights, *id.* at 973–74; third, that the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963), in several ways, *id.* at 974–75; fourth, that his due process rights were violated by the cumulative effect of trial errors, *id.* at 975; and fifth, that his mandatory life sentence was improper "because a jury did not find the existence of [his] prior felonies," *id.* at 976. Brown does not argue, let alone demonstrate, that the issues raised in this § 2255 proceeding are "both obvious and clearly stronger than the issues" counsel did raise on appeal. *See Martin*, 384 F.3d at 851. And, in any case, most of Brown's claims are meritless or frivolous. He has not shown deficient performance or prejudice.

## 2. Failure to Seek Rehearing

Brown next argues that appellate counsel "rendered deficient performance because she did not assist [him] with filing a petition for panel rehearing" after he "(and counsel) recognized that the appellate court ha[d] misapprehended trial facts." Statement Grounds Supp. 29. He states that "[c]ounsel agreed to seek permission to file an untimely petition for panel rehearing," yet failed to do so or advise Brown he could file a petition *pro se*. *Id.* at 30. Further, he argues that counsel interfered with his attempt to seek rehearing "because she did not notify [him] of the appellate court's decision until *after* the time to seek rehearing had expired." *Id.* at 30. The Government responds that counsel clearly evaluated the case "and determined a post-opinion

37

petition for rehearing would be frivolous," Resp. 48, and that "Brown fails to identify any basis

for the filing of a petition for rehearing," *id.* at 49.

"An appointed counsel's duties do not end when [the Seventh Circuit] renders an adverse

decision; counsel must consider filing post-opinion pleadings in the court of appeals." *United*

*States v. Shaaban*, 514 F.3d 697, 698 (7th Cir. 2008) (Ripple, J., in chambers).[19]  However,

counsel has no duty to file a frivolous petition.  *Id.*  Brown contends that counsel concluded that

a petition for *en banc* rehearing would be frivolous but not that a petition for panel rehearing

would be.  Statement Grounds Supp. 29–30.  He suggests that the issue that would be raised was

factual, *id.* at 29, but fails to identify the issue he believes counsel should have raised.  Even if

Brown could show deficient performance, then, he cannot show prejudice because he cannot

show that a petition for rehearing would have been successful.

### c.  Evidentiary Hearing

Brown's ineffective assistance of counsel claims—against trial counsel and appellate

counsel—are denied without an evidentiary hearing.  Most of Brown's claims are based only on

the record and the Court has found that the record shows he is entitled to no relief for those

claims.  *See Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (explaining that an

evidentiary "hearing is not required if 'the motion and the files and records of the case

---

[19] The *Shaaban* decision cites section V(3) of the Seventh Circuit's Criminal Justice Act Plan.  *Shaaban*, 514 F.3d at 698.  The Seventh Circuit plan states that "[a]fter an adverse decision on appeal . . . appointed counsel shall advise the defendant in writing of his right to seek review of such decision by the Supreme Court of the United States." Seventh Circuit Judicial Plan § V(3), http://www.ca7.uscourts.gov/rules-procedures/rules/rules.htm#planV (last visited Sept. 29, 2021).  "If . . . the represented person requests it and there are reasonable grounds for counsel properly to do so, the appointed attorney must prepare and file a petition for writ of certiorari and other necessary and appropriate documents and must continue to represent the defendant until relieved by the Supreme Court."  *Id.* "Counsel who conclude that reasonable grounds for filing a petition for writ of certiorari do not exist must promptly inform the defendant, who may by motion request this Court to direct counsel to seek certiorari."  *Id.*  It appears that that the requirement that counsel file petitions for rehearing in the Seventh Circuit is merely an interpretation of this provision.  *See Taylor v. United States*, 822 F.3d 84, 92 n.5 (2d Cir. 2016) ("[A] review of the Seventh Circuit's plan (which has not been amended since 1996, well before *Shaaban* was decided) shows that this statement was only a matter of interpretation, as that plan is materially the same as ours and makes no explicit mention of petitions for rehearing or rehearing *en banc*.").

conclusively show that the prisoner is entitled to no relief'" (quoting 28 U.S.C. § 2255(b))).  For

claims that rely on evidence outside the record, Brown has not done enough to warrant an

evidentiary hearing.  No evidentiary hearing is warranted "if the petitioner makes allegations that

are 'vague, conclusory, or palpably incredible,'" rather than "'detailed and specific.'" *Id.*

(quoting *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006)).  Brown has not alleged

specific facts that, if proven, would entitle him to relief.  *See Galbraith v. United States*, 313

F.3d 1002, 1009 (7th Cir. 2002).

## II.     Motion to Amend

Brown filed a motion to amend his 2255 Motion "to include a claim for relief pursuant to

[A]mendment 503, and a claim for relief under ineffective assistance of appellate counsel for her

failure to raise the argument regarding Amendment 503 on appeal."  Mot. Amend 1.  The

Government did not respond to this motion.

Amendment 503 to the United States Sentencing Guidelines changed the relevant

conduct Guidelines.   *See* United States Sentencing Guidelines Manual App. C, Vol. I, § 503.

Brown does not elaborate on how he believes this amendment is relevant to his case, but in any

case, he can show no prejudice because he was subject to a statutorily mandated life sentence.

His relevant conduct could alter his offense level—for example, it could lower the drug weight to

be attributed to him—but a change in his Guidelines range would not have affected his sentence.

The claim Brown seeks to add is clearly unmeritorious so the Court denies the motion to amend.

*See Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 707 (7th Cir. 2021)

("[C]ourts may deny a proposed amended pleading [under Federal Rule of Civil Procedure

15(a)(2)] if the amendment would be futile." (quotation marks omitted)); *see Johnson v. United*

*States*, 196 F.3d 802, 805 (7th Cir. 1999) ("Because the Rules Governing Section 2255

39

Proceedings for the United States District Courts do not deal with amendments to motions for collateral review, the district court should turn to Fed.R.Civ.P. 15(a).").

## III.   Certificate of Appealability

When a district court enters a final order adverse to an applicant, it must issue or deny a certificate of appealability.  Rule 11(a), Rules Governing § 2255 Proceedings.  A court can grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Brown has not made such a showing.  The Court, therefore, declines to issue a certificate of appealability.

## CONCLUSION

Accordingly, Petitioner Jerry Brown's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, Pursuant to Title 28, United States Code, § 2255, ECF No. 1, and Motion to Amend, ECF No. 13, are DENIED.  The Clerk is directed to enter judgment and close the case.

Entered this 29th day of September, 2021.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE